Good morning. Please report. Sherry Hohner appearing on behalf of Appellant Patrick Bills. In this particular case, what I'd like to address, for purposes of oral argument, is focus on the qualified immunity issues with respect to the detention. And also just to, I know that recently, Mina v. City of Simi Valley, there was cert granted in that case to the Supreme Court, and that was a case that was segmented in the brief. I just would like to address I wonder if you could speak up just a little bit. Sure, I'm sorry. I usually don't have that problem. And I would also like to address the Mina v. City of Simi Valley, which was recently granted cert. With respect to the qualified immunity, as the Court and Saucere had indicated that there's a two-part test. First, you need to show constitutionality, that there was a constitutional violation. And next, that the right was clearly established. With respect to the constitutionality of the detention, we've addressed it in our brief that there's been, there's three grounds for finding the detention in this case was unlawful. Number one, that the detention itself was unlawful. And then the second and third was based on the manner in which the detention was held. Let me just clarify from this standpoint. You already had a jury trial on, there was an original summary judgment with the excessive force, which had to do with everything, all the evidence of this case went before a jury on the excessive force claim, correct? And there was a defense verdict on that, right? Correct. All right, so why isn't this, if we parse this out in terms of the detention part of it, because the excessive force part of it had to do with the, what, the handcuffs? And he had injuries that he was able to show that had occurred from being handcuffed over that period of time and not loosening it, correct? Correct. Why isn't this just another jury trial on the exact same facts? Well, because it's a different theory of liability. Plus, the excessive force, one of the things that we addressed in our brief, was that because of the rulings on the detention and the search issue, it affected the presentation of the excessive force in a very important way. One of the strong arguments that counsel had made, the defense had made at trial, was that even though there was numerous witnesses that said that Mr. Bills had complained of pain, and even though they were independent witnesses that the jury had found credible, the problem was that the argument defense made was that, well, even if he complained, the officers didn't hear. So, therefore, it wasn't excessive, it was unreasonable if they didn't hear him. Our theory was that the reason why the officers did hear him complain, but they chose to ignore him, was because this was a type of way to force some sort of complaint. They were trying to coerce consent to search, to get into that residence, because they know that they didn't have a search warrant for the residence, they didn't have exigent circumstances or probable cause to get into the residence. And so, the — by preventing us from even mentioning the search, any time we tried to get into the search, the judge admonishes that we cannot go there. We both — she'd already ruled on — the Court had already ruled on the issue of the search. So, therefore, we weren't — Kagan. Well, let me just ask you this. If I — let's just — let's — let me put you over the first prong of sauté. Let's say I give you that. But on the second prong, if the officers were investigating an execution-style triple homicide that occurred just the previous week, the murder weapon had not been recovered. The officers were responding quickly to a telephone tip from a reliable source who believed the primary suspect was possibly in Bill's home or with Alvarez. Officers greeted Bill when he arrived at his house with his two passengers in his car. Alvarez and Alvarez's three-year-old nephew. Police initially believed Alvarez was the suspect. Bill's sons were in the house. The police were aware that Bill had been married to the suspect's sister and that the suspect had been at Bill's house within the previous three to four days and that Alvarez was the suspect's stepbrother. How — tell me why it would be clear to a reasonable officer confronted with these circumstances that the detention of Bill's in handcuffs for one hour was unlawful. Well, first — You know, tell me what cases would say that. You know, that's — Starting with U.S. v. Sharp, where it spoke about the reasonable detention and what's — when does the detention become changed to de facto arrest? You have that the detention lasts no longer — Well, but I want it — I want a detention on a triple homicide or — I mean, I want something with — this has some kind of, you know, sexy facts in terms of that doesn't make it — we're not talking about a detention on a shoplifting or something along those lines. And we're talking about something that's pretty fast-moving. We're talking about all of those facts. You know, what cases can you point me to that a reasonable officer should know that one hour would, you know — It's not a matter of the one hour. And first of all, there's a couple of things. The facts are viewed in the favor of — the light most favorable to Mr. Bill. And there's a lot of facts that I think are — that you raised there that I'll address those. Second, the test for being clearly established, it has to be — you look at the contours of the right, not a specific case where you've had this exact fact, because obviously that's not what the test is for the qualified immunity. It's whether — based on the — whether the contours of the right have been developed. And I would argue that the case specifically, Liston v. County of Riverside, where in that case — remember, the reason why Mr. Bills was stopped was because it was believed that Mr. Chavez — not Mr. Alvarez, Mr. Chavez — was in the vehicle. Mr. Chavez was the suspect, not Mr. Alvarez. And from the very beginning, the officers knew that Mr. Chavez was 6'2", 250 pounds, whereas Mr. Alvarez was 5'6", 280 pounds. From the very beginning, the officers radioed that it might be Mr. Chavez or the brother is going to be a close call. So immediately, even before this whole thing starts — Is it height that makes the difference or girth that makes the difference here? I think both. How do you tell the difference between 250 pounds and 280 pounds? Well, when you have a difference of 6 inches, or actually 8 inches in height, that's a — that does make a huge difference. So one is short and plump, and the other one is tall and normal-sized. Huge. But the point is, is that you have — so from the very beginning, there's a — they think that there — we might — but we also might have the brother. So what you're looking at is the reason for the stop. You have to look out in determining the detention. What was the purpose of the stop? The purpose of the stop was they thought that Mr. Chavez was in the vehicle. But they also were aware that perhaps he might not even be there, but they pull him over. Immediately, they find out that Mr. Chavez is not in the vehicle. In fact, when you listen to the tape and you look at the recording, that before they record — report to the dispatcher that they have two detained, they say, Mr. Chavez is not in the vehicle. So they know immediately. That was the purpose of this stop, was to see if Mr. Chavez was in the vehicle. In order to stop and now detain Mr. Bills any further, they have got to — and we're conceding that we're allowing them to — they mistake an identity. Allow them now to at least do a little bit of questioning. Who are you? What do you — you know, do a check on them. They did. That records check in which it was confirmed that Mr. Bills had no criminal record, that completed at 11.02 a.m. He wasn't released until 11.57. So what you have is you have Liston, who is saying once you've got the mistake and identity, it is unreasonable for the officers to detain them any longer. This is what the case is. And unless during that investigation those officers find additional facts to heighten and think that Mr. Bills is engaged in some sort of criminal activity, they've got no reason to detain him. Now, can they be concerned about their safety in terms of the — obviously, the gun has never been recovered. It was, I mean, an incredibly serious offense. I don't think anyone can really dispute that. Mr. Bills does have relationships that would allow him to get on the phone and go call someone or, you know, allow, you know, someone to come to the scene or compromise the officer's safety as they were securing it. I mean, can they consider those — I mean, can those be factored into the — Not really. You just let them go and leave all the officers on the scene, you know, let them go call his sister, let them go call the suspect, let them go do any of that? They've got to have some — yes, because of this fact. They've already done the investigation. They've asked the preliminary questions. Now, the only information the officer got from him was that he was related to Mr. Bills through his estranged wife of three-and-a-half years. But hadn't he seen her recently? Yeah, three or four days. When you say estranged, you know, estranged can mean you haven't seen someone for 20 years or it just means you, you know, you don't consider them your wife anymore or your husband. He had indicated to the officers that she had moved out three-and-a-half years ago. But the point is, is that it's the relationship with not his wife, but Mr. Chavez is what the issue is here. And in Stiegel v. U.S., the — remember, let me back up for just a second. So once you get to the point where you've investigated and there's been nothing additional to allow, the only information that officer has now is that, okay, he's a brother-in-law and he's been there three or four days earlier, what does that have to do with Mr. Bills being engaged in criminal activity to allow him? The only reason and what the district court found was the reason why this was lawful was because it was sufficient in time to determine who Mr. Chavez was, which was in the first five minutes or so of detention, and for the search. But this is the problem with the search. You have to — one of the things that allow the officers to continue is that it's an investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the person. In this case, there was no search warrant. So what you have to look at from that point when they find out that Mr. Bills is not involved in criminal activity because the purpose is effectuated, they know Chavez is in the vehicle, now you have to ask what basis do they have to detain him further? Unlike Michigan v. Summers, where this was a search warrant case, and even in MENA was a search warrant case. Can I ask you at what time they did find someone at the home, right? They did find somebody there. Yes. What time did that happen? You mean actually after they entered the car? I mean, I'm sorry. The home. The home. Let's see. I'm not sure the exact — what I can tell you, I can't remember the first entry. I know that the house was cleared, so both sons were removed by 1134. And I believe the first son was removed almost immediately, so that was probably about 1120. So even if, under Judge Callahan's theory, there was a reason to keep hold of him until the house was searched and cleared, there was then still more detention after that? Exactly. And that's what's really important to note here, too. Even if he said it was reasonable to hold him, at 1134, they radioed that the house is cleared, the search is negative. They wait another 20-plus minutes before they release him. He's still being detained during that time. And so there is no justification. Even if the court was to say, okay, they're justified up through the search, which I don't believe that they were, but even if the court was to find that, there's another 20 minutes where the officers are just sitting around waiting for a canine unit. And, again, one of the problems about going back to the trial is that by not allowing for the search, we can't argue, well, the purpose they're waiting for that canine unit is because they didn't find anything. And now, if they bring a canine in there, they can basically search where they weren't otherwise entitled to search by searching for a person and hope to find some sort of evidence so that we can now, again, coerce later to try to get them to give up Mr. Chavez somehow. So we weren't even allowed to argue that at the trial either. What basis, if any, other than the relationship did the police have to think that this plaintiff would have assisted Chavez? There was none. They did try to argue that, well, the fact that he drove from one residence to the other. But you have to look at what all the information that the officers possessed at that time. They waited. When they called into the residence, Mr. Martinez says, first of all, Mr. Alvarez says, I'm getting ready to head out the door to go to work. I'm going over to my brother-in-law's house. He tells the officer that. The officer says, so you better make it quick. The officer says, I'll be by in a couple minutes. Officers don't. They wait. They do wait. 20, 25. How long do they have to wait? 20, 25 minutes the officer doesn't show. He's got two kids at home. Gets in the car. He goes back. They take the time to bring a three-year-old in. If you listen to that tape, it's really telling. You listen that there's not a matter of somebody rushing to escape. It's like, they're coming. Oh, no, they went back in the house. They're coming out. No, they went back in the house. Oh, they're just messing around with the car. So all this information going into whether it's reasonable that he's trying to help him escape. And when they get to the house, they're cooperative, and he says what? He was going back to the house to help him paint. He had a Wal-Mart receipt on him. There was paint supplies in the car. So everything could be confirmed. There was no basis. There's no – in fact, it's objectively, I believe, totally unreasonable to think that if they were rushing over to the house to help him escape, they would take the time to put a three-year-old in the backseat in a car seat to rush over so they can inform him, especially if they have a phone. For the – in terms of the procedural posture of the case, we don't have to agree that you are necessarily correct, but only that this is the evidence in the light most favorable to your client, precluding summary judgment, correct? Correct. And I see that my time – Your time has expired. We'll hear from Mr. Harrell. Please report. My name is Kjell Harrell. I'm here for the city of Rialto. As the court has indicated and as counsel has indicated, this is a qualified immunity case. The qualified immunity doctrine worked as it was intended to work in this case. The reason why we have the qualified immunity doctrine, the reason why the Supreme Court said that we need it, is because the Constitution is an evolving document with many circuits, many federal courts every day saying what the Constitution means under a given fact pattern. Law professors, licensed attorneys, the judges struggle over what it means in a given fact pattern. Officers don't have this type of training, but what they do have is a concern that any time that they act, any time that they act, that someone is going to sue them. Someone is going to say – Well, there's a line to be drawn in every case, though. I mean, surely you also can see that sometimes officers cross that line and they are held liable under the Supreme Court law. And there are a great number of cases that have been published by this circuit and others where that has happened, and the Supreme Court, too. This is not that case. Well, would you agree or disagree with the proposition that it's clearly established that in order to detain someone, there has to be some good reason? I mean, that's not a legalism, but there has to be a good reason, and you can't just hold on to somebody without a good reason. Is that well established? That is well established. And what the summary judgment was about, and what the trial was about, was all the good reasons. All the good reasons that are being used. The trial was about excessive force and not length of detention, though, right? As your colleague on the bench has indicated, though, all the evidence came in. All the evidence was heard by the jury. Well, that's not my question. Was the plaintiff allowed to argue that the length of detention alone was a violation of his constitutional rights? We have indicated towards the end of our brief extensive sites to the record where an opening statement during the middle of the case, closing, plaintiff's counsel had a great deal to say about that there was just no reason. I think maybe I'm not making my question clear. If the jury had found that the level of force was not excessive, but that the police had no reason to be holding on to this person for the length of time that they did, could they, under the instructions, have brought back a verdict for the plaintiff or not? My understanding of where we are and what you're asking me is it was framed to the jury. My client, this is the plaintiff's counsel speaking, my client was held for an excessive amount of time for no reason, and he was in pain. That doesn't answer my question. If the jury found as a fact that there wasn't any excessive force, that nobody was pushed around or in pain, and they didn't believe he was in pain, but they also found as a fact that he was held much too long, would they have been allowed to find in his favor or not? In other words, is this a new theory of liability that they were not allowed to consider separately? My understanding of the way that it was posed by a plaintiff's counsel was you may find for my client, based on an excessive force theory under Graham v. Connor, you may find for my client based on the length of time that he was subjected to force. Beyond the arguments of counsel, what did the instructions to the jury say on this question? They were Graham, they were just straight Graham instructions. I think they were Ninth Circuit pattern instructions, just the straight Graham factors, and plaintiff's counsel did argue. On excessive force, though, right? Yes. Okay. Let's focus on the second problem of Saussure on the one-hour detention in handcuffs. Giving all facts, giving all inferences in favor of the plaintiff, what was going on for that hour, and what is your best argument that a reasonable officer under these circumstances would think that a one-hour detention was okay under the existing law? The record is replete with evidence that was placed before the trial court at the summary judgment stage with regard to level two of the Saussure case. Well, just give me your best argument here. Okay. Don't tell me it's replete. Just give me your best argument. Okay. Well, to be honest with you, while I was saying that, I was thinking of what the evidence was. We all do that. We all do that. You don't have to be that honest. I just picked the right page. I'm going to lay it on the table. All right. That's what we're doing here. There was a wealth of information that tied Mr. Bills to the criminal investigation that was going on here. At the outset, the Rialto Police Department was trying to solve a triple murder. What's in the record that is basically not disputed as to why they couldn't take his cuffs off at 1127 or whatever after they got the kids out of the house? What's in the record? They could have, sure. They could have, but the point of qualified immunity is unless plaintiff's counsel can cite to a case published and on the books at the time that this incident happened and said that they had to as a matter of constitutional law, this is unconstitutional. But you started out by agreeing with me that it was well established that you couldn't hold on to somebody if you didn't have a good reason to. And if all their good reasons had dissipated, then why isn't there a claim? Well, here's where my point is. The whole argument here is about the length of time. Because plaintiff's counsel candidly, at page 35 of their opening brief on this appeal, they say it was reasonable to place our client in handcuffs, Mr. Bills in handcuffs, given the gravity of the situation. That's right. And then she's conceded that again here. So what were they doing the rest of the time? Here's what they were doing the rest of the time. Initially, the officers, based on everything that they knew and all the factors that placed Mr. Chavez inside Mr. Bills' home, they decided that they were not going to leave until they established if he was inside the home. And this is particularly so when they called inside the house. And according to their training, they were trying to diffuse matters. They were trying to end it before something started. They called inside the house. Mr. Bills has already told them, my two sons are inside that house. They are asleep. Well, it's 11 o'clock in the morning. Well, but they got them out, right? What is the reason, at a minimum, after they learned that it was in fact two young people who were asleep and they said, looking at it most favorably to him, as we must on summary judgment, there's nothing in the house that suggests that Chavez is there by about 1130-something, and yet he is still detained for another 20 minutes after that. Looking at the facts most favorably to him, as we have to on summary judgment, what happened after that that justified the continued detention? I don't want the court to get the wrong idea about the timeline here. I'm not sure where Plaintiff's Counsel's timeline is coming from. I've got citations throughout the record that say that after Mr. Bills was handcuffed in the backseat, they're going to make entry into the home to rescue his sons because they have a concern that they're being held hostage. Why don't they pick the phone up? So at this point, there are not enough of them there. Officers wait for an overwhelming show of force, so hopefully the person behind the door won't use force at all. They'll realize it's hopeless, and they'll give up, and nobody gets hurt. So they call. They wait for enough officers to come. That takes 10 minutes. The sons are found and evacuated, and then there is a 10-minute search of the house, the lower portion of the house, okay? But they're not done because they're concerned that Mr. Chavez is up in the attic, and out of officer safety reasons, they do not want to climb up there. What they want to do is they want to use a canine because— And what does Mr. Bills have to do with any of this at this point? Mr. Bills, at this point, they suspect him being involved in this man trying to— Based on what? Based on, A, the family relationship. Based on, number two, the fact that when they call Mr. Bills that Mr. Alvarez is home, and they say, We are coming over within 20 minutes, that's what Mr. Bills says, and we have to credit him. After 20 minutes, they take off. They go straight to the only other house where the eyewitness, April Watson, has placed Mr. Chavez. And so they go straight to that house, and they want to sort it out. This is a Terry stop. It's not an arrest. All they need is reasonable suspicion.  Are we going to drag all these officers into court for a civil trial when the record shows that all they were trying to do was save the lives of Mr. Bills' sons and protect themselves so they could go home to their family and friends at the end of the day? When you say this is a Terry stop, how many Terry stops have the application of handcuffs like this? Oh, Your Honor, numerous in this circuit, and I imagine yours. We have a footnote where we have a great number of Ninth Circuit cases where plaintiffs have come in, such as the plaintiff here, and have said, My client was handcuffed. That makes it arrest automatically. It's a bright-line test. It is an arrest, and you need probable cause, and you didn't have it. And this circuit has said repeatedly, No. It's not that mechanical. It's not that bright line of a test. What we do as a circuit, what the Fourth Amendment means is we are going to do an analysis of how quickly you move to dispel the reasonable suspicions that you have, and we recognize sometimes for officer safety reasons why that's going on, you want the person handcuffed. If there was one officer out there to guard Mr. Bills, Mr. Alvarez, who had a warrant on a weapons charge, and then when the two sons came outside, there was one officer to guard them, who wouldn't put them in handcuffs? These are two family members, maybe four family members of Mr. Bills, depending on whether the marriage is still active or not. They certainly have been identified as friends. Mr. Chavez has been in this man's home within three days by his own admission. And here's an important point. Officers, according to this circuit, are allowed to use their experience and their training to assess if somebody is telling them the truth. Was it completely out of bounds and out of line if Mr. Chavez is going to indicate, if Mr. Bills is going to indicate, yeah, he was in my house three days ago, my sons are inside, I don't know why they aren't answering the phone. Is it completely out of bounds for these officers to follow up and find out if this triple murder suspect is in the home? This is why we have qualified immunity, and this is where I started saying I believe that the doctrine worked in this case, according to what this circuit has said. The Supreme Court in Malley v. Briggs has talked about we want officers to be shielded from these type of lawsuits unless they are plainly incompetent or they knowingly violate the law. I submit to you on this record, there's no indication of plain incompetence here. What this court is seeing and what the trial court saw is law enforcement trying to solve a triple homicide. They weren't going into that house to get a jaywalker or an underage drinker. They were trying to protect their town, and this court has the power to encourage that type of activity by affirming the summary judgment that was granted. The only real question is what the connection is with this person. I mean, even in doing this incredibly important thing that they were doing, they can't just grab up a passerby and say, well, we're investigating a murder, so we're going to hold you. They have to have at least a reasonable suspicion that there's some connection, and that has to continue as long as they're holding him. And I guess my concern is that period of time between when they find that he has told the truth, they find his son's in the house, and they say, well, yeah, I guess that's right. It's between then and when they let him go. So the ruling this court needs to make, I suppose, is whether it was plainly incompetent for those officers to bring over a canine unit and search that attic to see if the triple homicide. No, the question is whether they had a reasonable suspicion to hold him while they did that. But I guess I'm not even agreeing with either of you. I think on the second prong of saucier, the standard is what a reasonable officer under these circumstances would have thought about what he was doing. When you take into consideration the case law that was clear at the time and the circumstances that that officer was presented in. Now, can I get any agreement on that? Absolutely. And what I've been speaking with, and I guess I should say level one or level two before I start to talk, what I've been speaking about with your colleague is level one. But then we move to level two. Even if a plaintiff wins, even if you give it to a plaintiff on level one, then we've got level two. And the court is exactly right. What a plaintiff needs to be doing is cite some type of case. And I guess if we want to hone in on the facts of our case, and this is where we need to be, some type of clearly established law that would have told these officers it is plain incompetence if you hold this man to call for a canine unit so you don't have to go up into the attic so we can send the dog up. A fortunate fact of life is. . . I don't mean to pick on your words, but it's not incompetence. It's got to be clear to him that that would be a violation of the law. Because there are things that people can do that are incompetent and probably not good police work, but they're not necessarily a violation of the law. The whole reason why this case is in federal court is because the plaintiff is claiming a violation of his constitutional rights. It's not a police malpractice case. I was quoting from a case called Malley v. Briggs. I feel like I'm hearing a lot of jury arguments on both sides, and I'm trying to focus on what the law is and what I've got to look at. What plaintiffs have cited to is the listing case. That is the only case that they have cited to as putting our officers on notice that this was plainly incompetent. The listing case was a mistaken identity case. There was none of these extra factors about somebody in the house and sons maybe being held hostage, somebody in the attic, triple murder. It was just plain mistaken identity with no officer safety concerns. Mania v. City of Simi Valley. That case came out after the incident. And if there's one thing that we can all agree on here, it's that after-incident authority does nothing to clearly establish the law at the time that these officers were required to act. I see my time has expired. I will submit unless the Court has any questions. I don't believe we have any further questions. Thank you. Your Honor, thank you. We allowed your opponent to go over time a little bit, so we'll give you a minute for rebuttal if you'd like it. Thank you, Your Honor. Briefly, I'd like to address a few of the points. First of all, with respect to whether a plaintiff was allowed to argue excessive, that the excessive time in which they were held was unlawful detention, I would refer the Court to the record at ER 363 and 364 and 377 through 379, in which the Court specifically, we were definitely not allowed to argue the time in which she was detained was excessive. Second, with respect to having, again, to cite with the qualified immunity issue, we do not have to cite to a specific case that these particular facts have been resolved. It's the contours. You have Liston, which says this is a mistaken identity. The reason why they stopped was they thought Chavez was in the car. But also, you have Stigl versus the United States, which was decided in 1981, and there the Court cautioned about that. The issue in that case was whether you could get into a home with an arrest warrant, a home of a third party with an arrest warrant. But the Court cautioned that if they were to allow that, the police could then what? They could go into the homes of relatives and acquaintances based on the mere fact that they were related. And the Court cautioned. And that was enough, I think, to put them also on notice. No hostage situation. There was nothing in the record. If you listen to that audio, they were never concerned with the children's safety. And besides, in terms of whether they were being held hostage, and they were removed from that. I mean, they got out of the house. You have those 20 minutes where we definitely know they're not being held hostage. And the Terry stop, in the question with the Terry stops where this issue comes up about the handcuffing, that is where those individuals themselves are engaged. There's a reasonable suspicion that they're engaged in criminal activity during that time period. Thank you, counsel. The case just argued is submitted. We appreciate the arguments of both parties. They've been quite helpful. And we'll turn to the last case on the morning docket, which is Lemon v. Lappin. A fruit and a rat. Can I believe? Let's see.
judges: Gibson, Graber, Callahan